*The proprietors of side-booms in* ANDROSCOGGIN *river vs.*
HASKELL & *al.*

The *proviso* in the private act of *March* 15, 1805, incorporating the Proprietors of
the side-booms in *Androscoggin* river, with the right of toll, and in the additional
act of *Feb.* 29, 1812, " that the fees aforesaid shall, at all times hereafter, be
subject to the revision and alteration of the legislature," is not satisfied by a
single act of revision of the tolls therein established; but is a subsisting and
perpetual reservation of the right to increase or reduce the fees from time to
time, at the pleasure of the legislature.

Therefore, where, by a subsequent statute, the fees were increased above the rate
first established, but without any new reservation of the power of revision, it
was held that the legislature still had the power of reducing them at its pleasure.

The provision in the private act of *March* 21, 1829, that the same corporation shall
not be entitled to receive toll till the logs in their booms are surveyed by a sur-
veyor appointed by the selectmen of *Brunswick* or *Topsham,* is constitutional;
and it is the duty of the corporation, and not of the owner of the logs, to cause
such survey to be made.

THIS was *assumpsit* for tolls, for securing the timber logs of the
defendants in the plaintiff's booms above the bridge, at the lower
falls in *Brunswick,* charged at fifty cents the thousand.

The corporation was created by the private act of *March* 15, 1805,
authorizing certain individuals to lay and maintain side booms in
*Androscoggin* river, from the bridge between *Brunswick* and *Tops-
ham,* down to the narrows, for the purpose of stopping and securing
masts, logs and other lumber. In the fourth section of this act va-
rious tolls were established for the timber so secured, and among
them for board-logs at the rate of forty cents for a thousand feet of
boards, concluding thus :—"*Provided nevertheless,* that the fees afore-
said shall, at all times hereafter, be subject to the revision and alter-
ation of the legislature." By the additional act of *Feb.* 29, 1812,
the proprietors were authorized to extend their booms above the
bridge, to any place within the limits of *Brunswick* and *Topsham* ;
the tolls generally were revised ; and the toll for board-logs was re-

duced to thirty cents, with a similar reservation of the power of alteration and revision. Another act was passed *Jan.* 31, 1820, authorizing the proprietors to extend their booms at the carrying place to within eight rods of the *Topsham* shore; and raising the toll for board-logs alone, to fifty cents the thousand; without any express reservation of any farther right to revise or alter the tolls. By another act of *March* 15, 1821, this toll was again reduced to forty cents, with an express reservation of the legislative right to revise and alter, as before. By the resolve of *Feb.* 15, 1828, the proprietors were required, on or before a certain day, to make such piers and booms for the security of lumber as should be adjudged sufficient for that purpose by certain commissioners therein named, upon pain of prosecution to judgment of forfeiture of their charter; and their right to receive tolls was in the mean time suspended. This resolve was complied with. And by another statute passed *Feb.* 27, 1829, the selectmen of *Brunswick* and *Topsham* were required annually to appoint two or more suitable persons to be surveyors of logs at the side booms in those towns; who were to be duly sworn, and liable to certain penalties for any fraud or falsehood in the exercise of their office; and the proprietors were prohibited from receiving any tolls for logs, unless such logs, after having been rafted out, had first been surveyed by such surveyor, and a certificate of the survey delivered to the person receiving the same. The tolls for board-logs were by this act again reduced to thirty cents the thousand, with an express reservation of the right of future revision, as before.

It appeared, at the trial of this cause before the Chief Justice, that prior to the act of 1829, it was the practice of the boom-master to survey the logs as they were rafted out, in order to enable him to return an account of the quantity to the treasurer, whose duty it was to collect the tolls; and that no charge was made for such survey. If the owner of the logs was dissatisfied, he had the right to procure another survey, at his own expense. After the passage of the act of 1821, and until that of 1829, the treasurer claimed no more than forty cents the thousand; but after the passage of the latter act, the proprietors passed a vote disapproving the conduct of

their officers in receiving a less sum than fifty cents, asserting their title to this latter toll, and directing the adoption of legal measures to collect it; after which he demanded fifty cents.

. The defendants brought into court, upon the common rule, the sum of seventeen dollars, being the amount of their tolls at the rates mentioned in the statutes, up to the time of the appointment of surveyors under the act of 1829. At the time of taking out their logs, the defendants required that they should be surveyed by a surveyor appointed by the selectmen of one of the towns, according to the act of 1829, which the boom-master declined, denying it to be his duty to procure such survey; but he offered to survey and deliver them according to the usage which existed before the passage of that statute; which the defendants declined; and the logs were delivered without survey into the defendants' hands, saving the rights of both parties.

Upon these facts the cause was reserved for the decision of the court; a verdict *pro forma* being returned for the plaintiff; which was to be amended, or set aside and the plaintiff nonsuited, as the court should determine.

*Fessenden* and *Sprague*, for the plaintiffs, argued that the right reserved by the legislature to alter the rates of toll could be exercised but once; and when thus exercised, the force of the proviso was spent. The act of 1820, increasing the toll, to fifty cents, was a new and distinct grant to the corporation, absolute in its terms; and which could not constitutionally be resumed, nor abridged. The acts of 1821 and 1829 are therefore unconstitutional and void, as they are an attempt to take away rights already vested, and against the will of the corporation. *Fletcher v. Peck*, 6 *Cranch*, 87; *Dartmouth College v. Woodward*, 4 *Wheat.* 518; *Calder v. Bull*, 2 *Dall.* 386; *Dash v. Van Kleeck*, 7 *Johns.* 477; *Society, &c. v. Wheeler*, 2 *Gall.* 139; *Charles river bridge v. Warren bridge*, 7 *Pick.* 344; *Propr's Ken. purchase v. Laboree*, 2 *Greenl.* 275.

But if those statutes are constitutional, yet being merely contracts, they are not binding on the corporation till accepted; and here is no evidence of any corporate act of acceptance. *Andover & Medf.*

*turnp. v. Hay*, 7 *Mass*. 102 ; *Essex turnp. corp. v. Collins*, 8 *Mass*. 292 ; *Hayden v. Mid. turnp. corp.* 10 *Mass.* 397 ; *Prop'rs Canal bridge v. Gordon*, 1 *Pick.* 297.

The act of 1829, they contended, was not to be understood as imposing on the corporation the duty of procuring a surveyor. If it did so, it was unconstitutional, as superadding a new obligation to a subsisting contract.

*Allen* and *Packard*, for the defendants.

The opinion of the Court was read at the ensuing *September* term as drawn up by

MELLEN C. J.    The plaintiffs contend that ever since the act of 1820 was passed, they have been entitled to boomage for logs at the rate of fifty cents per thousand, because, as that act contains no proviso, as the other acts do, the legislature had no constitutional power to reduce the amount of boomage thereby granted to the corporation.   The correctness of this position the defendants deny ; and whether the legislature had such right is one of the questions to be decided.   It is a correct principle that a grant is a contract ; and that rights absolutely vested under it, cannot be divested by an act of the legislature ; to this point we will merely cite *Fletcher v. Peck*, 6 *Cranch* 87 ; *State of New Jersey v. Wilson*, 7 *Cranch* 164 ; *King v. Dedham Bank*, 15 *Mass.* 454 ; *Foster & al. v. Essex Bank*, 16 *Mass.* 270 ; *Charles river bridge v. Warren bridge*, 7 *Pick.* 344.   But it is urged as a settled principle, and not denied, that where by the terms of a charter the legislature reserve to themselves the right to declare it void or revoke it, if certain events should take place, or to modify the terms of it in certain particulars according to their pleasure, they have a constitutional right so to do ; because the charter is accepted on these conditions : and the principle here applies, *cujus est dare, ejus est disponere*.   The logs, for the boomage of which the present action is brought, were boomed and secured in virtue of the act of 1812, extending the charter above the falls and bridge.   As has been before observed, the same proviso is found in both the acts granting the right of maintaining

booms to the corporation; and both acts have been accepted.   Here then we are led to the inquiry, "what is the legal import of the proviso in the act of 1812, and what is its effect?   Its language is, "the fees aforesaid shall at all times hereafter, be subject to the revision and alteration of the legislature."   Does the expression refer merely to the fees particularly stated in that act?   If so, then they could never be subject to the revision and alteration of the legislature but once; and if instead of being increased to fifty cents per thousand, they had been reduced to twenty-five cents by the act of 1820, they could never have been raised again by virtue of the proviso merely; for on this principle the proviso would have been satisfied—have done its office, and spent all its force.   Nearly at the same time, the proprietors of *Saco* boom were incorporated.   The language of the proviso there is, "the fees or toll shall at all times hereafter," &c. Besides, such a construction is expressly repugnant to the language of the proviso, which is, "the fees aforesaid shall at all times hereafter be subject to the revision and alteration of the legislature." This must mean something more than one alteration.   We apprehend the true construction to be more liberal than that for which the plaintiffs contend; and in order to give effect to the plain language of the proviso, we must understand it in the same manner as though it had been this: "provided nevertheless, that the amount of fees for stopping in said river and rafting and properly securing logs and other lumber as aforesaid, shall at all times hereafter be subject to the revision and alteration of the legislature."   Such a construction makes the language of the proviso sensible and consistent; and gives effect to every part of it.   Such, certainly, must have been the manner in which the legislature understood it, when they passed the act of *March* 15, 1821, as in the act of *January* 1820, the proviso was not inserted.   In aid of our construction we may well suppose that the right of revision and alteration was reserved to the legislature, because the experiment, being a new one, and the anticipated profits uncertain, such a power might be highly useful, if not necessary, to prevent an undue or unreasonable income to the corporation; and the frequent changes and gradual reduction, as to the amount of boomage, furnish us with proof of the wisdom of those who in-

serted this proviso in the first and second acts before mentioned. It is true the same proviso is contained in the acts of 1821 and 1829 ; it was probably transcribed from the former acts without any particular motive, or else from abundant caution ; but as, in our opinion, the insertion of the proviso, in any of the acts subsequent to that of 1812, *was wholly unnecessary,* the omission of it in the act of 1820, could not operate as a limitation upon the constitutional power of the legislature in 1821, to reduce the boomage in question from fifty cents to forty cents per thousand ; or of the legislature in 1829, to reduce it from forty to thirty cents per thousand.   In the case of *Holbrook v. Holbrook,* 1 *Pick.* 254, the court observe that the general system of legislation on the subject matter, may be taken into view, to aid the construction of any one statute relating to the same subject.   In the numerous acts, establishing turnpike corporations, it will be found on examination that no right is reserved to the legislature to revise and alter the established toll at pleasure or until after a limited period.   It is true they may increase the tolls without any *such reservation, though not reduce them.*   So far as we have examined other acts granting tolls to bridge proprietors or canal proprietors, we have found no such reservation as that contained in the proviso under consideration.   The natural inference from this distinguishing fact is that the legislature intended, in the present instance, to place the subject of fees or boomage, completely under their own control ; so that at all times afterwards, they might have the undisputed power of regulating the income of the proprietors from this source, according to circumstances, by increasing or reducing the boomage.   We cannot conceive that a proviso so unusual should have been introduced, to enable the legislature to make a single alteration—say, a reduction of two cents per thousand on logs, and in the same proportion on other timber and articles, and there be compelled to stop for want of authority to proceed any further. From a cursory examination of the acts of Massachusetts granting charters of the kinds before mentioned, it appears that no proviso of the kind in question is introduced until the year 1804, and very few are found till our own government was organized ; since which time

it seems to have been the practice to introduce it in cases where tolls or fees are granted.

As to the boomage of all the logs boomed and received after the 21st of *March*, 1829, the defendants contend that the plaintiffs have no right to maintain their action, because the same were not legally surveyed, according to the provisions of the first and second sections of the act of 1829. The first section declares " that it shall not be lawful for the proprietors to ask, demand or receive the toll established by this act, of the owners of logs, by said corporation rafted out of said booms and secured for the several owners thereof, unless said logs, after they are rafted out of said booms and secured, shall be duly surveyed by a surveyor appointed and sworn as is hereafter provided ; and a bill of the survey of said logs shall be delivered to the person receiving the same." The second section provides for the appointment of such surveyors and their qualification ; which appointment is to be made by the selectmen of *Brunswick* and *Topsham*. The case finds that the logs referred to in this objection were never surveyed in the manner prescribed by the statute above mentioned ; and the answer made to this objection is that the first section is unconstitutional, as it impairs the rights granted to the corporation by subjecting them to burdens and expenses, inconsistent with those rights, and, in their operation, destructive of them. By the terms of their charter, the proprietors have the control of the logs, until delivered to the owners ; and a right to retain them until the toll or boomage is paid or secured to their satisfaction. They, of course, were obliged to have the logs surveyed by some person or persons, before the act of 1829 was passed, in order to ascertain the amount of toll or boomage which they had a right to demand and receive of the owners ; and the report states that prior to that act " it was the practice of the boom-master to survey the logs as they were rafted out, in order to enable him to return an account of the quantity to the treasurer and collector, whose duty it was to collect the boomage ; and no charge for such survey was made." It is understood that the nature of the survey is such as to be attended with very little trouble ; and if there formerly was any expense attending it, that expense was borne by

the corporation. The act of 1829 has only provided, and doubt-less for good reasons, that some indifferent and disinterested person or persons should make this survey; being appointed in the manner before mentioned, and acting under the sanction of an oath. It does not appear that such a survey is more troublesome or onerous to the corporation than any other, though probably it is more satisfactory, if not more correct and important; and, in order to insure such a survey, a certificate, in conformity to the act, is made a necessary preliminary to a recovery of the toll or boomage. We do not per-ceive how the provisions of the act now under consideration oper-ate to destroy or impair any of the rights granted to the corporation by their charter. The cases, or several of them, cited by the coun-sel for the defendants, presented to the consideration of the court questions arising out of acts of the legislature, at least as liable to objection on constitutional grounds as the section of the act under examination. See also 4 *Peters* 514. It is not retrospective in its provisions; even if it compels the corporation to incur a small ad-ditional expense in the survey, it is no more than was required of the banks in procuring and using stereotype plates. It declares that proof of a survey, according to its provisions, shall be necessary to entitle the corporation to recover their fees. The legislature may surely prescribe what evidence shall be necessary to support actions of a particular kind; and, if in writing, how it shall be obtained and certified. Unless an act of the legislature, or some part of it, is evi-dently unconstitutional, this court would never feel at liberty to pro-nounce it so. The section imposes no new duty, but only requires that an existing duty shall be performed by persons of a certain character. The resolve of *February* 15, 1828, declared that un-less this same corporation should, on or before the 15th day of *Sep-tember* then next, make, erect and finish such piers and booms, at and above the carrying place in said river, between *Brunswick* and *Topsham,* as should be adjudged, upon view by certain persons spe cially designated, sufficiently strong, substantial and extensive to stop and secure all masts, logs and other lumber floating down said river, it should be the duty of the attorney general to take legal measures for causing their charter to be vacated; and that until

61

such piers and booms should be completed, and certified to be so by such designated committee, the corporation should have no right to receive any toll or fees. Here were duties and conditions imposed, not embraced in the charter; but the report states that pursuant to the resolve the piers and booms were completed and a certificate given accordingly. The corporation considered the subject under the control and jurisdiction of the legislature, and conducted accordingly. On the whole, we are satisfied that the objection as to the constitutionality of those parts of the act of 1829 which we have been examining cannot be sustained. On this principle it appears that nothing more was due to the plaintiffs when the action was commenced, than the sum of seventeen dollars, which was brought into court on the common rule, and now belongs to the plaintiffs; and according to the terms of the report the verdict must be set aside and a nonsuit entered.